UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 09-23248-CIV-HUCK/BANDSTRA

QUAIL CRUISES SHIP MANAGEMENT,
LTD.,

    Plaintiff,
v.

AGENCIA DE VIAGENS CVC TUR
LIMITADA, et al.,

    Defendants.
_____/

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

This matter is before the Court on the Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted (D.E. #202) filed by Agencia de Viagens CVC Tur Limitada ("CVC"), Valter Patriani, SeaHawk North America, LLC, and Rodolfo Spinelli (collectively "Defendants"). The Court has considered the Motion to Dismiss, the related briefing, and is otherwise duly advised. For the reasons discussed below, the Court denies Defendants' Motion to Dismiss in full.

**I.   FACTUAL AND PROCEDURAL BACKGROUND**

This is an action by Quail Cruises Ship Management, Ltd., a Bahamian cruise ship operator, in which Quail alleges that the Defendants fraudulently induced it into purchasing the passenger ship *M/V Pacific* through the purchase of stock of Templeton International, Inc., a Bahamian corporation whose principle asset was the *Pacific*.[1] Quail purchased the stock from Flameck International S.A., a Uruguayan corporation. Flameck is not a party to this action because the Share Purchase Agreement between Quail and Flameck contained an arbitration clause.

In its Amended Complaint (D.E. #90),[2] Quail contends that the Defendants conspired to induce it to purchase the Templeton stock by concealing and fraudulently misrepresenting the *Pacific*'s deteriorating and unsafe condition. Specifically, Quail alleges that CVC, a tour operating company and prior owner of the *Pacific*, and its president, Valter Patriani, directed SeaHawk, the

---

[1] The facts relating to the sale of the Templeton stock and the events preceding this suit are set forth extensively in this Court's prior orders, and the Court need not recount them here.

[2] This Court dismissed Quail's initial Complaint with leave to amend on April 14, 2010. *See* Order on Mot. to Dismiss (D.E. #87).

1

company that supervised the vessel's operations, and SeaHawk's president, Rodolfo Spinelli, to defer repairs and conceal the deteriorated condition of the *Pacific*. Quail also claims that SeaHawk influenced Lloyd's Register North America, Inc. ("LRNA"), the classification society responsible for inspecting the vessel, to provide favorable evaluations so as to conceal the vessel's true condition.[3] Furthermore, Quail alleges that the Defendants and their representatives made material misrepresentations regarding the vessel's condition prior to the sale of the Templeton stock.

The Amended Complaint contains a claim for securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5; maritime tort claims for fraud in the inducement and recklessness; and common law claims for civil conspiracy to commit fraud in the inducement, negligence and negligent misrepresentation, fraud in the inducement, and breach of fiduciary duty. On August 6, 2010, this Court dismissed the Amended Complaint. This Court determined that Quail's securities fraud claim was insufficient under the "transactional test" set forth in *Morrison v. National Australia Bank, Ltd.*, 130 S. Ct. 2869 (2010), because the Amended Complaint did not allege the requisite domestic transaction. As such, Quail lacked a federal cause of action under 28 U.S.C. § 1331. After also determining that Quail's maritime tort claims failed the test for admiralty jurisdiction, this Court concluded that it lacked subject matter jurisdiction over the litigation and dismissed the case.

The Eleventh Circuit, however, vacated this Court's order of dismissal. *See Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307 (11th Cir. 2011). In determining that this Court erroneously concluded that it lacked subject matter jurisdiction, the Eleventh Circuit first recognized, in a footnote, that the "issue of extraterritoriality goes only to the ability to state a claim, not subject matter jurisdiction." *Id.* at 1310 n.3. It then proceeded to address the issue of whether the purchase or sale of the Templeton stock occurred in the United States. The Eleventh Circuit found that Quail alleged that the closing of the sale actually occurred in the United States and that the purchase and sale agreement confirmed that it was not until such closing that title to the shares was transferred to Quail. It also determined that, by definition, the transfer of title constituted a sale. Accordingly, the Eleventh Circuit concluded that "we cannot say at this stage in the proceedings that the alleged transfer of title to the shares in the United States lies beyond § 10(b)'s territorial reach." *Id.* at 1310–11. The Eleventh Circuit remanded the case to this Court for further proceedings.

---

[3] This Court dismissed LRNA as a defendant on September 21, 2011. *See* Order of Dismissal as to Def. Lloyd's Register North America, Inc. (D.E. #196).

The Defendants now seek to dismiss the Amended Complaint for failure to state a claim.[4] In their Motion to Dismiss, the Defendants contend that Quail's securities fraud claim should be dismissed because the sale of the Templeton stock does not constitute the sale of a "security" as such term is defined by the Securities Exchange Act. They also argue that Quail failed to plead fraud with the level of particularity required by Federal Rule of Civil Procedure 9(b) and under the Private Securities Litigation Reform Act ("PSLRA"). Furthermore, the Defendants claim that the alleged misrepresentations do not amount to actionable fraud and that Quail could not have reasonably relied on such misrepresentations. Finally, they argue that, if this Court does not dismiss the Amended Complaint in its entirety, it should dismiss Quail's claims for negligence and maritime recklessness and exclude those alleged misrepresentations that are non-actionable as a matter of law. Each argument is addressed in turn below.

## II.  LEGAL STANDARDS

Ordinarily, the Federal Rules of Civil Procedure simply require "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Factual allegations need only "be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Claims of fraud, however, including the securities fraud claim at issue here, are governed by the heightened pleading standards of Rule 9(b), which require a complaint to "state with particularity the circumstances constituting fraud." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

Furthermore, the PSLRA requires that a complaint for securities fraud alleging misleading statements or omissions specify each allegedly misleading statement and the reasons why it is misleading, and, where an allegation is made on information and belief, the complaint shall "state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (describing the PSLRA's heightened pleading instructions); *Mizzaro*, 544 F.3d at 1238 (same). The PSLRA raised the standard for pleading

---

[4] SeaHawk, Spinelli, and CVC asserted the defense of failure to state a claim upon which relief can be granted in their Answer and Affirmative Defenses to the Amended Complaint (D.E. #200). Because this Court determined that it was in the interest of justice to hear this defense at this time, it ordered the Defendants to file an appropriate motion or advise the Court that they would not continue to assert such defense. *See* Order (D.E. #201). The Defendants subsequently filed this Motion to Dismiss.

scienter in that "a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b)." *Mizzaro*, 544 F.3d at 1238.

Despite the pleading standards detailed above, a court presented with a Rule 12(b)(6) motion to dismiss a § 10(b) claim must still, "as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs Inc.*, 551 U.S. at 322. Furthermore, a court must consider the complaint in its entirety, as well as other sources ordinarily reviewed on a motion to dismiss. *Id.*

### III. LEGAL ANALYSIS

#### A. Law-of-the-Case Doctrine

As a preliminary argument, Quail urges this Court to deny the Defendants' Motion to Dismiss because, during the prior appeal in this case, the Eleventh Circuit determined that Quail adequately stated a claim upon which relief can be granted, and the issues raised in the present Motion to Dismiss are thus foreclosed by the law-of-the-case doctrine. *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss (D.E. #210) at 8. Specifically, Quail contends that because the Eleventh Circuit noted that the issue of extraterritoriality goes "only to the ability to state a claim, not subject matter jurisdiction," and because the appellate court then concluded that Quail's claim was "within section 10(b)'s 'territorial reach,'" the Eleventh Circuit decided that Quail adequately stated a claim under § 10(b) as well. *Id.* at 9 (citing *Quail Cruises Ship Mgmt. Ltd.*, 645 F.3d at 1309 n.3, 1310). In further support of its argument, Quail notes that the Eleventh Circuit declined to address the issue of admiralty jurisdiction because it found that this Court has supplemental jurisdiction over Quail's maritime and common law claims due to the presence of the securities fraud claim. *Id.*

The Defendants, in response, contend that the Eleventh Circuit did not hold that Quail stated a claim under the Securities Exchange Act. *See* Defs.' Reply in Supp. of Mot. to Dismiss (D.E. #211) at 2. Rather, the Defendants argue that the only issue decided by the appellate court was "whether the purchase or sale at issue was adequately alleged to have occurred within the United States to render the Securities Exchange Act applicable to Plaintiff's claims." *Id.*

Quail's interpretation of the Eleventh Circuit's holding on appeal is unfounded, and in turn, its argument that the law-of-the-case doctrine precludes this Court from addressing the issues in the present Motion to Dismiss is misplaced. The law-of-the-case doctrine provides that "the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *This That and the Other Gift and*

4

*Tobacco, Inc. v. Cobb Cnty., Ga.*, 439 F.3d 1275, 1283 (11th Cir. 2006) (quoting *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir. 1990)). As such, this doctrine "bars relitigation of issues that were decided either explicitly or by necessary implication." *Id.* The doctrine, however, "does not extend to every issue that could be ever raised in a given litigation." *Heathcoat*, 905 F.2d at 370. Rather, it is "limited to those issues previously decided." *Id.*; *see also Luckey v. Miller*, 929 F.2d 618, 621 (11th Cir. 1991) (noting that the doctrine "does not bar consideration of matters that could have been, but were not, resolved in earlier proceedings"); *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1550 n.3 (11th Cir. 1990) ("[T]he law of the case does not bar litigation of issues which might have been decided but were not.") (internal quotation marks omitted); *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir. 1984) ("[T]he doctrine encompasses only those issues previously determined.").

In this case, the issue that the Eleventh Circuit decided was simply whether the Securities Exchange Act applied to Quail's claim given *Morrison*'s recent pronouncement regarding the territorial scope of § 10(b). *See Quail Cruises Ship Mgmt. Ltd.*, 645 F.3d at 1310 ("[T]he only issue under *Morrison* is whether the 'purchase or sale' occurred in the United States."). After analyzing this issue, the appellate court concluded that "we cannot say at this stage in the proceedings that the alleged transfer of title to the shares in the United States lies beyond § 10(b)'s territorial reach." *Id.* at 1310–11. There is no indication that the Eleventh Circuit determined, explicitly or by implication, that Quail sufficiently alleged all of the elements necessary to state a claim under § 10(b). Indeed, there was no need to decide this, as the sole basis for the dismissal of Quail's securities fraud claim below was that Quail did not allege the domestic transaction required by *Morrison*.[5] *See Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1332 (11th Cir. 2005) (declining to apply the law-of-the-case doctrine where the issue of standing was never before the appellate court during the prior appeal because the "case law could not be clearer" that this doctrine "cannot apply when the issue in question was outside the scope of the prior appeal."). Accordingly,

---

[5] At most, an argument can be made that, to conclude that the sale of the security at issue occurred in the United States, as is required under *Morrison*, the Eleventh Circuit necessarily determined that the transaction at issue involved a "security," an issue the Defendants contest in the instant Motion to Dismiss. Quail, however, does not make this argument here. Furthermore, there is no indication that the Eleventh Circuit did anything other than assume a security existed—as the question of whether the transaction involved a security was neither before the Eleventh Circuit on appeal nor the basis for this Court's earlier dismissal—and determine where the purchase or sale of such security occurred.

5

this Court finds that the law-of-the-case doctrine does not prohibit it from addressing the present Motion to Dismiss and will proceed to the merits of the Defendants' arguments.

### B. Pleading Fraud in Connection with a "Security"

To state a claim under § 10(b) and Rule 10b-5, the anti-fraud provisions of the Securities Exchange Act, a plaintiff must allege 1) a material misrepresentation or omission; 2) scienter; 3) a connection with the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) a causal connection between the misrepresentation and the loss. *See Scaturro v. Seminole Cas. Ins. Co.*, 542 F. Supp. 2d 1290, 1296 (S.D. Fla. 2008). In the instant Motion to Dismiss, the Defendants' first contention is that Quail cannot allege that the purported misstatements or omissions occurred in connection with the purchase or sale of a security because the transaction at issue does not qualify as the purchase or sale of a "security" as that term is defined in the Securities Exchange Act. Specifically, the Defendants argue that Quail failed to allege that what it purchased bears the usual characteristics of stock and that this alone requires dismissal of the securities fraud claim. *See* Mot. to Dismiss at 10. Further, the Defendants contend that the economic realities of the sale of the Templeton stock demonstrate that the instrument sold does not qualify as a security. *Id.* at 11.

The law in this area is well settled. In *Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985), the Supreme Court explicitly held that "where an instrument bears the label 'stock' and possesses all of the characteristics typically associated with stock, a court will not be required to look beyond the character of the instrument to the economic substance of the transaction to determine whether the stock is a 'security.'" *Gould v. Ruefenacht*, 471 U.S. 701, 704 (1985) (discussing and applying the holding in *Landreth* on the same day *Landreth* was decided) (internal citation omitted). This rule recognizes that "stock is, as a practical matter, always an investment if it has the economic characteristics traditionally associated with stock." *Reves v. Ernst & Young*, 494 U.S. 56, 62 (1990). Accordingly, it is unnecessary to examine the economic realities of the transaction to decide whether an instrument constitutes a security in such circumstances. *See Landreth*, 471 U.S. at 693 ("Instruments that bear both the name and all of the usual characteristics of stock seem to us to be the clearest case for coverage by the plain language meaning of the definition.").

Here, Quail and Flameck entered into a Share Purchase Agreement whereby Flameck, the owner of "all of the issued and outstanding shares (the "Shares") of the share capital of Templeton International, Inc.," agreed to sell its shares to Quail. Share Purchase Agreement (D.E. #202-1) at 1. Additionally, and contrary to the Defendants' contentions, the Amended Complaint states that

6

this action arises out of the sale of "traditional stock" and that the shares purchased possess the characteristics commonly associated with stock. Specifically, the Amended Complaint provides that the Templeton stock "is able to grant its holder voting rights and rights to receive dividends" and "is capable of appreciating and depreciating in value, and of being pledged or hypothecated, transferred or sold." Am. Compl. ¶ 3. These are the very characteristics of stock enunciated by the Supreme Court in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975). Quail has therefore sufficiently alleged that it purchased a "security" under the rule set forth in *Landreth*. *See Scaturro*, 542 F. Supp. 2d at 1296 (S.D. Fla. 2008) ("Here, Plaintiff has sufficiently alleged that he purchased 'stock' in Seminole within the meaning of the [Securities Exchange Act]. This is because the shares Plaintiff purchased were called 'common stock' in the Agreement, and also because Plaintiff pleads those shares bear many of the usual characteristics of stock.").

The Defendants' reliance on *Vujasin v. Chef Vincent, Inc.*, No. 08-22048, 2008 WL 4792049 (S.D. Fla. Oct. 31, 2008), is misplaced. The Defendants direct the Court to *Vujasin* as an example of a post-*Landreth* decision in which a court examined the economic realities of an instrument labeled "stock" to determine whether it was in fact a security. In *Vujasin*, however, the court explicitly stated that the plaintiffs "have not argued that the stocks in question possess any of the five characteristics from the *Forman* test" and that there was "no evidence that the shares were ever used to pay dividends or create a system of voting rights for the holders." *Id.* at *1–2. Accordingly, it was appropriate for the court in *Vujasin* to "look beyond the character of the instrument to the economic substance of the transaction." *Gould*, 471 U.S. at 704. Here, unlike in *Vujasin*, Quail alleges that the instrument in this case bears both the name and characteristics of stock, and it is thus unnecessary to conduct any further inquiry.

### C. Pleading Fraud under Rule 9(b) and the PSLRA

The Defendants next argue that Quail's Amended Complaint should be dismissed because Quail does not allege fraud with the particularity required by Federal Rule of Civil Procedure 9(b) or plead scienter with the specificity required under the PSLRA. As discussed below, however, Quail has satisfied the pleading requirements of both Rule 9(b) and the PSLRA.

#### 1. Pleading with Particularity under Rule 9(b)

With respect to Rule 9(b), the Defendants do not dispute that the Amended Complaint adequately sets forth the "who," "what," "when," "where," and "how" of the fraud. *See* Defs.' Reply in Supp. of Mot. to Dismiss at 5 (noting that the Defendants' Motion to Dismiss "does not attack the

7

Amended Complaint (D.E. #90) on those grounds, so those arguments need not be considered here"). Rather, Defendants' sole contention is that the Amended Complaint does not comply with Rule 9(b)'s heightened pleading standards because it fails to allege what the Defendants obtained as a result of the fraud.  *See* Mot. to Dismiss at 11.  In response, Quail claims that, although it is not required under Rule 9(b) to set forth what the Defendants obtained as a consequence of the fraud, its Amended Complaint does in fact allege how the Defendants benefitted from the fraud in this case. *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss at 14–15.

As written, Rule 9(b) does not expressly require a plaintiff to allege what was obtained as a result of the fraud.  Rule 9(b) simply provides that, for allegations of fraud, "a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  In the Eleventh Circuit, however, alleging the benefit obtained by a defendant has become part of the accepted test for determining whether a plaintiff has sufficiently alleged fraud under Rule 9(b)'s heightened standards. *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) ("Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtains as a consequence of the fraud.'" (quoting *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997))).  Furthermore, while case law provides that "alternative means are also available to satisfy the rule," *Brooks*, 116 F.3d at 1371, courts in this circuit have dismissed fraud claims where a plaintiff fails provide what the defendant obtained from an alleged fraud.  *See In re Eagle Bldg. Techs., Inc., Sec. Litig.*, 319 F. Supp. 2d 1318, 1332 (S.D. Fla. 2004) ("Because Plaintiffs' Complaint fails to state what [a defendant] obtained as a consequence of the fraud, it must be dismissed under Rule 9(b).").

In the present case, Quail has sufficiently alleged what the Defendants obtained as a result of the fraud.  While the Amended Complaint may not provide any individual allegation that, by itself, satisfactorily describes what the Defendants gained from misleading Quail, the allegations of the Amended Complaint, taken collectively, set forth what the Defendants obtained from their fraudulent conduct.  *See Prager v. FMS Bonds, Inc.*, No. 09-80775, 2010 WL 2950065, at *5 (S.D. Fla. July 26, 2010) (noting that, while the only express reference to what the defendants gained lacked the necessary specificity when viewed in isolation, "what was 'obtained as a consequence of the fraud' may be reasonably inferred from the specific circumstances alleged in the complaint").

8

In the Amended Complaint, Quail alleges that CVC was the *Pacific*'s beneficial and de facto owner. Am. Compl. ¶¶ 2, 96. Upon information and belief, CVC also controlled Flameck International S.A., the company that sold the Templeton shares to Quail. Am. Compl. ¶ 65. The Amended Complaint additionally provides that CVC and Patriani, along with SeaHawk and Spinelli, sought to conceal material damage to the *Pacific* and exert influence over LRNA "as part of [a] scheme to inflate the value of the Vessel in advance of the sale of Templeton stock." Am. Compl. ¶¶ 56, 108(c). The Templeton stock ultimately sold for approximately $14,892,000 in June 2008. Am. Compl. ¶ 66. Furthermore, the Amended Complaint alleges that CVC was a beneficiary from the sale of the Templeton stock. Am. Compl. ¶ 7. Such allegations, taken together, indicate that the benefit CVC and its president, Patriani, obtained as a result of the fraud was the ultimate sale of the Templeton shares, and the *Pacific*, to Quail at an artificially inflated price. *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss at 15 ("CVC, under Patriani's direction, obtained the sale of the Templeton shares that CVC held through Flameck International S.A., a company controlled by CVC.").

With respect to SeaHawk and its president, Spinelli, the Amended Complaint provides that both SeaHawk and Spinelli acted as agents of CVC and Patriani. Am. Compl. ¶¶ 15, 16. And, as stated above, Quail alleges that SeaHawk and Spinelli acted with CVC and Patriani to inflate the value of the *Pacific* prior to the sale of the stock to Quail. Am. Compl. ¶¶ 56, 108(c). Then, during "intense negotiations" with Quail regarding the purchase of the Templeton stock, Patriani asked Quail to "maintain SeaHawk as the Vessel's technical manager after the sale on the assurance that SeaHawk's technical history with the Vessel was essential for maintaining the Vessel in good working order and condition and represented that this would facilitate CVC's ability to charter the Vessel back from Quail." Am. Compl. ¶ 108(i). After the closing, SeaHawk remained responsible for the operations of the *Pacific* in hopes of procuring a formal management agreement from Quail. Am. Compl. ¶ 68. Taken collectively, these allegations demonstrate that, in addition to assisting in the sale of the *Pacific* at an artificially inflated price by their principal, CVC, "through their active participation in the alleged fraud, SeaHawk, under Spinelli's control, continued to receive management fees from CVC." Pl.'s Opp'n to Defs.' Mot. to Dismiss at 15; *see also* Am. Compl. ¶ 118 ("The relationship between the Defendants was financial, creating incentive for SeaHawk to continue to receive management fees . . . after the closing on the sale of Templeton's stock if the actual condition of the Vessel remained concealed such that CVC could sell the Vessel to Quail for substantial profit . . . .").

9

Because the Amended Complaint adequately sets forth what the Defendants obtained as a result of the fraud and because the Defendants do not dispute that Quail has otherwise alleged the "who," "what," "when," "where," and "how," of the fraud, Quail has satisfied the heightened pleading requirements of Rule 9(b). *See CC-Aventura, Inc. v. Weitz Co.*, No. 06-21598, 2009 WL 2030378, at *4 (S.D. Fla. July 9, 2009) (holding that an allegation that CC-Aventura "engaged in a plan of misrepresentations to avoid paying the all-risk insurance policy's $250,000 deductible," along with other allegations detailing the statements and omissions made, the time, place, and person responsible for such statements, and the manner in which such statements were misleading satisfied Rule 9(b)).

### 2. Pleading Scienter under the PSLRA

For Quail's securities fraud claim to survive the Motion to Dismiss, however, Quail must also satisfy the pleading standards set forth in the PSLRA. In their Motion to Dismiss, the Defendants contend that Quail fails to meet these standards. As noted above, the PSLRA raised the standards for pleading scienter, the "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.*, 551 U.S. 308 at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). "The PSLRA provides that plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind' in alleging a section 10(b) claim." *Scaturro*, 542 F. Supp. 2d at 1301 (citing 15 U.S.C. § 78u-4(b)(2)). Thus, to sufficiently allege scienter under the PSLRA, Quail must state with particularity facts giving rise to a strong inference that the Defendants acted either with an intent to deceive, manipulate, or defraud or with severe recklessness. *See Mzizaro*, 544 F.3d at 1238 ("Although the PSLRA substantially raised the *pleading* standard for scienter, it did not change any *substantive* intent requirements. In this Circuit it is by now well-established that § 10(b) and Rule 10b-5 require a showing of either an intent to deceive, manipulate, or defraud, or severe recklessness.") (internal citation and quotation marks omitted); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir. 1999) ("[A] complaint alleging with particularity that a defendant acted with a severely reckless state of mind still suffices to state a claim for civil liability under § 10(b) and Rule 10b-5.").

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court established the framework for determining whether a securities fraud complaint sufficiently alleges scienter under the PSLRA. First, when "faced with a 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim upon which relief can be granted, accept all factual

10

allegations in the complaint as true." *Tellabs, Inc.*, 551 U.S. at 322.  Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss." *Id.*  The Supreme Court noted that the proper inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Id.* at 323.  Third, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  The Supreme Court concluded that a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Although the Defendants argue that Quail fails to adequately plead scienter under the PSLRA, they seem to concede that the test set forth in *Tellabs* has been satisfied.  In their Motion to Dismiss, the Defendants contend that Quail does not allege a motive for the purported fraud and that CVC's commitment to take the Vessel back on charter during the Brazilian cruising season is inconsistent with evidence that the Defendants were aware of the *Pacific*'s deficient condition.  Defs.' Mot. to Dismiss at 12–13.  They then conclude that, "[b]ased on the foregoing, the inference that [the Defendants] represented the condition of the Vessel as they thought it to be, supported by the very class certifications Plaintiff complains of, is at least as strong as the inference that they intentionally deceived Plaintiff." *Id.* at 13.[6]

This, however, is all that is required to satisfy *Tellabs.*  As noted above, to determine whether a complaint adequately alleges scienter, this Court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs, Inc.*, 551 U.S. at 326.  In other words, if the strength of the inference of scienter is equal to or greater than the strength of any opposing inference, the complaint survives.  Thus, by stating that the inference that the Defendants represented the condition of the *Pacific* as they thought it to be "is at least as likely as" the inference that they acted with an intent to defraud Quail—or in other words, by stating that the strength of an opposing inference is at least equal to the strength of an inference of scienter—the Defendants essentially acknowledge that Quail alleges scienter with the requisite particularity.

---

[6] In their Reply, the Defendants similarly state that "the inference that [the Defendants] represented the condition of the Vessel as they thought it to be is at least as likely as the inference that they acted with an intent to defraud Plaintiff."  Defs.' Reply in Supp. of Mot. to Dismiss at 8.

11

In any event, irrespective of the Defendants' acknowledgment, the Court finds that the Amended Complaint sufficiently sets forth facts giving rise to a strong inference of scienter. The allegations regarding the Defendants' statements about the condition of the vessel and subsequent discovery of the use of painted cement to hide its true condition are a prime example of facts that, taken together, give rise to the inference of scienter required by *Tellabs*. The Amended Complaint provides that, in early 2008, Patriani and other CVC representatives told Quail that CVC spent "significant sums of money in correcting all deficiencies and making improvements to the Vessel" and that "the Vessel had been completely restored." *See* Am. Compl. ¶¶ 54, 55, 58, 108. Specifically, they informed Quail that CVC spent "over $15,000,000 correcting all deficiencies." Am. Compl. ¶¶ 60, 108(i). Additionally, in April and May of 2008, Spinelli represented that "SeaHawk had supervised all the costly repairs undertaken by CVC to address all the class concerns." Am. Compl. ¶¶ 59, 108(h). In May and June of 2008, Spinelli informed Quail that the *Pacific* would be "delivered free of any deficiencies that could affect her operation as a fully functional cruise ship." Am. Compl. ¶¶ 62, 108(k). He again assured Quail that the twenty-two outstanding Conditions of Class "had been corrected under his supervision and the resulting Conditions of Class deleted by LRNA as a result thereof." Am. Compl. ¶¶ 62, 108(k).

Quail contends, however, that in actuality CVC directed SeaHawk "to defer repairs, conceal damage by widespread use of painted cement to cover up corrosion, wastage and structural damage, and otherwise mask the true deteriorated, wasted and damaged condition of the Vessel." Am. Compl. ¶ 27. Quail further alleges that, throughout negotiations, Spinelli "withheld information about the extensive use of painted cement to hide the widespread corrosion and wastage." Am. Compl. ¶¶ 57, 108(f). The Amended Complaint then provides that post-sale surveys conducted by Lloyd Register surveyors different from those previously designated by LRNA in coordination with SeaHawk, the first of which occurred only two months after the sale, began to reveal the *Pacific*'s true condition. Am. Compl. ¶ 70. Such surveys revealed significant corrosion, thinning, and wastage throughout the vessel and that much of this damage had been hidden by layers of cement paint. *See* Am. Compl. ¶¶ 74, 89, 94. Finally, Quail contends that "[t]he widespread use of cement to conceal wastage and corrosion is not an accepted practice" and that it was "impossible for widespread stop-gap cement usage to be used on the Vessel without the express knowledge of its ship management company, SeaHawk, with approval from the de facto owner CVC." Am. Compl. ¶¶ 95, 96. Such facts, taken collectively, give rise to an inference of fraudulent intent, or at a minimum,

12

severe recklessness, that is cogent and certainly at least as compelling as the inference that the Defendants represented the condition of the *Pacific* as they truly thought it to be. Quail, therefore, has satisfied the heightened standards for pleading scienter as set forth by the PSLRA.[7]

### D. Forward-Looking Statements, Materiality, and Reasonable Reliance

In the final section of their Motion to Dismiss, the Defendants urge this Court to dismiss Quail's securities fraud claim because certain alleged misrepresentations are non-actionable forward-looking statements, because the remaining misrepresentations are non-actionable puffery, and because the "as is where is" language and the integration clause in the Share Purchase Agreement render Quail's reliance on any misrepresentations unreasonable. *See* Defs.' Mot. to Dismiss at 13. Even if this Court were to assume that the paragraphs identified by the Defendants as forward-looking statements do in fact constitute forward-looking statements,[8] and that some of the alleged misrepresentations amount to no more than mere puffery, the Amended Complaint sets forth enough

---

[7] As a last attempt to demonstrate that Quail did not plead fraud with specificity, the Defendants contend that Quail failed to plead that several of the representations set forth in the Amended Complaint were actually false. This argument merits little discussion. While Quail refers to what the Defendants "represented," as opposed to what they "misrepresented," in certain paragraphs, the Defendants ignore the fact that the allegedly insufficient paragraphs fall under the portion of the Amended Complaint entitled "Defendants' Material Misrepresentations and Omissions Prior to the Stock Acquisition." *See* Am. Compl. at 18–23. Furthermore, these same paragraphs are restated in full in Count I of the Amended Complaint, which, prior to listing the Defendants' statements, provides that the Defendants "made the following material misrepresentations or omissions" to induce Quail to acquire the stock and, in turn, the *Pacific*. *See* Am. Compl. ¶ 108.

[8] It is unlikely, however, that the statements challenged as forward looking actually qualify for protection under the PSLRA's safe harbor provision. The PSLRA "shields defendants from liability for forward-looking statements, regardless of defendant's state of mind, if the statements are either (1) 'identified as . . . forward-looking statement[s], and . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s],' or (2) 'immaterial.'" *Theoharous v. Fong*, 256 F.3d 1219, 1225 n.6 (11th Cir. 2001) (citing 15 U.S.C. § 78u-5(c)(1)(A)(i) & (ii)). This provision is the counterpart to the judicially created "bespeaks caution" doctrine. *See In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1361 (N.D. Ga. 2002). Even assuming that paragraphs 8, 9, 18, 21, and 25 of Amended Complaint are forward-looking statements, they are not accompanied by the kind of "meaningful cautionary statements" the PSLRA requires. The Defendants point to the "as is where is" language of the Share Purchase Agreement as appropriate cautionary language. *See* Defs.' Mot. to Dismiss at 14. Cautionary statements, however "must be 'detailed and informative' and must warn the reader 'what kind of misfortunes could befall the company and what the effect could be.'" *Waterford Twp. Gen. Employees Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CIV-22572, 2010 WL 1332574, at *11 (S.D. Fla. 2010) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)). The "as is where is" language of the Share Purchase Agreement simply does not constitute a sufficient cautionary statement.

material factual allegations, such as those discussed in detail in Part III.C., *supra*, for Quail's securities fraud claim to survive the instant Motion to Dismiss. Accordingly, the Court need only address the Defendants' contentions regarding reasonable reliance.

The Defendants argue that Quail should be precluded from relying on any of the alleged misrepresentations based on the language of the Share Purchase Agreement. The Share Purchase Agreement provides that "the Seller makes no warranties or representations as to the condition of the Vessel" and that the *Pacific* was being transferred on an "as is where is" basis. Share Purchase Agreement ¶ 3(e). Additionally, the Share Purchase Agreement provides that "the Seller makes no representation or warranty, express or implied, in respect of the Shares or the Company or any of its assets, liabilities or operations, and any such other representations or warranties are hereby expressly disclaimed." *Id.* at ¶ 3(f). Furthermore, the Share Purchase Agreement provides that "[t]his Agreement . . . constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements, understanding, negotiations and discussions, whether oral or written, of the parties." *Id.* ¶ 7. Accordingly, the Defendants argue that Quail should be precluded from relying on the Defendants' misrepresentations as a matter of law.

While courts, in some instances, have held that the inclusion of a "no other representations" or integration clause bars a claim as a matter of law, the circumstances of this case caution against a determination, at this stage of the litigation, that the language of the Share Purchase Agreement precludes Quail from relying on the Defendants' statements. First, it is important to note that the Share Purchase Agreement is an agreement between Quail, the "Buyer," and Flameck International S.A., the "Seller." Although CVC alleges the existence of some relationship between CVC and Flameck, CVC itself is not a named party to the contract. And, as a general rule, a non-party to a contract may not invoke that contract for his benefit. *See Galstaldi v. Sunvest Communities USA, LLC*, 637 F. Supp. 2d 1045, 1055 (S.D. Fla. 2009) ("As the Eleventh Circuit has noted, there is a general rule that a non-party to a contract may not invoke the contract") (internal quotation marks omitted); *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 921 (6th Cir. 2007) (declining to create a "*per se* rule with respect to non-reliance clauses" and finding it "noteworthy that the appellees were not themselves parties to the subscription agreement containing the non-reliance clause").

Furthermore, the language of the Share Purchase Agreement is not so strong as to mandate a finding that Quail's reliance on the Defendants' statements was unreasonable as a matter of law.

In cases holding that a plaintiff is barred as a matter of law from relying on statements outside a contract, the language of the contract is usually extremely detailed or exceptionally clear. In *Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996), the issue before the court was "whether parties who negotiate at arm's length for the sale and purchase of a company can define the transaction in a writing so as to preclude a claim of fraud based on representations not made, and explicitly disclaimed, in that writing." *Id.* at 339. In concluding that the parties could preclude such a claim, the Second Circuit noted the extensive amount of representations actually bargained for within the agreement itself:

> Harsco bought Section 2.04's fourteen pages of representations. Unlike a contractual provision which prohibits a party from suing at all, the contract here reflects in detail the reasons why Harsco bought MultiServ—in essence, Harsco bought the representations and, according to Sections 2.05 and 7.02, nothing else. This means that there are fourteen pages of representations, any of which, if fraudulent, can be the basis of a fraud action against the seller. But Harsco specifically agreed that representations not made in those fourteen pages were not made. Thus, it is not fair to characterize Sections 2.05 and 7.02 as having prevented Harsco from protecting its substantive rights. Harsco rigorously defined those rights in Section 2.04.

*Id.* at 344. The Second Circuit, however, noted that the "analysis becomes a question of degree and context," and cautioned that in different circumstances, a "'no other representations' clause might be toothless." *Id.* The language of the Share Purchase Agreement in the present case falls far short of the level of detail in the agreement discussed above, and, accordingly, should not preclude Quail from relying on the Defendants' misrepresentations as a matter of law.

Finally, the extent and nature of the alleged fraud counsels against invoking the language of the Share Purchase Agreement to bar Quail's claim at this time. Quail not only contends that the Defendants made fraudulent misstatements and omissions, but also that the Defendants influenced LRNA, the classification society responsible for inspecting the *Pacific*, "to withdraw, revise, extend or delete Conditions of Class against the Vessel . . . to inflate the value of the Vessel in advance of the sale of Templeton stock." Am. Compl. ¶ 56. In a transaction such as this one, it is reasonable to rely on the results of surveys and inspections conducted by entities such as LRNA, as continued classification after periodic inspections and surveys represents that a vessel is seaworthy and fit for its intended purpose. *See* Am. Compl. at ¶ 34. Here, however, Quail alleges that the results of LRNA's inspections and surveys—which should have informed Quail of the *Pacific*'s true

15

condition—were inaccurate and in fact part of the fraud itself. If Quail relied on such inspections and surveys, Quail may have had little reason to question the "as is where is" language or other clauses of the Share Purchase Agreement. It may not have sought better protection for itself in terms of the contract with Flameck because it was under the reasonable assumption that it could rely on LRNA's pre-sale surveys and inspections as an accurate statement of *Pacific*'s condition. Accordingly, the "as is where is" language and other clauses in the Share Purchase Agreement should be considered in light of all of the circumstances of this case and at a more appropriate stage of these proceedings. *See Bruschi v. Brown*, 876 F.2d 1526, 1529 (11th Cir. 1989) ("Determinations of whether an investor's reliance was justified requires the consideration of all relevant factors, including: (1) the sophistication and experience of the plaintiff in financial and security matters; (2) the existence of long standing business or personal relationships between the plaintiff and the defendant; (3) the plaintiff's access to relevant information; (4) the existence of a fiduciary relationship owed by the defendant to the plaintiff; (5) concealment of fraud by the defendant; (6) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations. No single factor is dispositive; all most be considered and balanced in determining whether reliance was justified."). For these reasons, and the reasons stated above, Quail's securities fraud claim survives the Defendants' Motion to Dismiss.

### E. Remaining Issues

The Defendants contend, however, that even if Quail's federal securities fraud claim survives, and the Court, therefore, is not required to dismiss the entire case, the Court should, at the very least, dismiss certain aspects of Quail's claims. First, the Defendants request that the Court dismiss Quail's claim for recklessness (Count IV) for failure to state a cause of action. The Defendants simply state that because the Court previously dismissed this count for failure to state a cause of action, and because Quail brought this claim again in its Amended Complaint "without significantly changing its contours," the Court should dismiss the claim again. *See* Defs.' Mot. to Dismiss at 8–9. The Defendants, however, do not elaborate on this argument. While the Defendants raise this argument in the introductory sections of the Motion to Dismiss, it is not mentioned whatsoever in the memorandum of law and analysis that follows. And, although a comparison of the initial Complaint and the Amended Complaint reveals that Quail revised its maritime recklessness claim to contain more detailed factual allegations and to incorporate the revised introductory allegations of the Amended Complaint, the Defendants fail to identify any factual

allegation within this count that is insufficient or otherwise explain to this Court why Quail's revised recklessness claim should not survive. Without sufficient argument from the Defendants on this point, the Court is not in a position to grant their request to dismiss Quail's recklessness claim.

The Defendants also urge this Court to strike certain paragraphs of Quail's claim for negligence and negligent misrepresentation (Count V). The Defendants contend that this Court should strike paragraphs 145 and 150 because this Court previously noted that "the alleged wrongful conduct is more accurately described as misrepresentations made in connection with a contract for the sale of [a] vessel," and these two paragraphs "appear to allege negligence apart from the misrepresentations." Defs.' Mot. to Dismiss at 9. Again, the Defendants do not elaborate on this argument. Review of this Court's August 6, 2010 Order on Motions to Dismiss Amended Complaint (D.E. #148), however, reveals that this Court made the above statement in addressing Quail's failure to meet the test for maritime jurisdiction. This Court stated:

> A plaintiff may not artificially create federal jurisdiction by creatively defining the relief sought or the claim asserted in an attempt to bring the claim within traditional maritime jurisdiction. Quail attempts to characterize its maritime claims as arising out of the pre-sale management, repair, and classification of the *Pacific*. However, ***the alleged wrongful conduct is more accurately described as misrepresentations made in connection with a contract for sale of that vessel.*** Quail cannot invoke federal admiralty jurisdiction by recasting a fraudulent sale claim as a claim for damages to the vessel.

Order on Mots. to Dismiss Am. Compl. at 8 (emphasis added) (internal citations omitted). In context, it is evident that the Court made this statement to distinguish this case from the types of actions or activities typically required to bring a case within this Court's admiralty jurisdiction. It should not, however, be read to limit Quail's claims once the jurisdiction of this Court has been established. *See Quail Cruises Ship Mgmt. Ltd.*, 645 F.3d at 1311 (noting that, "because [Quail's putative maritime tort claims] form 'part of the same case or controversy' as Quail's securities fraud claim, the district court has, at the very least supplemental jurisdiction over those claims") (internal quotation marks omitted).

IV. **CONCLUSION**

At this stage of the litigation, Quail has adequately set forth the requisite elements of its claims and has done so, where necessary, with the specificity required by Rule 9(b) and the PSLRA. The misstatements and omissions alleged in the Amended Complaint are sufficient to withstand the Motion to Dismiss. Furthermore, the mere fact that the Share Purchase Agreement contains "as is

17

where is" language and an integration clause is, at this time, insufficient to render Plaintiff's reliance on Defendants' allegedly fraudulent statements unreasonable as a matter of law. Accordingly, for the reasons set forth above, the Defendants' Motion to Dismiss is DENIED.

DONE AND ORDERED in Chambers, Miami, Florida, January 24, 2012.

Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of record